WEST BROTHERS, INC., et al. *v.* HERRINGTON

No. 42252     April 10, 1962     139 So. 2d 842

*Dudley W. Conner*, Hattiesburg, for appellant.

(1)

2

*Lawrence D. Arrington,* Hattiesburg, for appellee.

Jones, J.

This is an appeal from a judgment rendered in the Circuit Court of Forrest County in favor of appellee for personal injuries. The facts sufficient to understand the ruling of this Court are undisputed. The appeal here is by West Brothers, Inc. Lippencott did not appeal.

The University of Southern Mississippi is situated at Hattiesburg, Mississippi. Their football team bears an enviable reputation and the people of Hattiesburg are interested in the football team as well as in the college itself. In the month of September 1960, there was a group of citizens of Hattiesburg working for the promotion of the golden anniversary of the college and for a "sell-out" for the first home football game. A meeting of civic minded citizens had been held; Mr. H. E. West, president of appellant, and Mr. W. N. McInnis, vice-president, attended the meeting called for such purpose. A parade was planned in connection with the anniversary, and the accident here involved occurred on the day the said parade was held, but before the parade.

Mr. Herbert Aplin was parade chairman, and, as such chairman, he requested Mr. McInnis to obtain a truck and trailer on which the band of the college might be carried in the parade. Mr. McInnis talked to Mr. West about using a company truck. West Brothers had

no trailer but it was agreeable that one of the trucks be used, and Mr. McInnis contacted another company, Hinson Ford, Inc., which company agreed to furnish a trailer. It was then necessary to secure a driver. West Brothers had a number of drivers and an inquiry was made of them as to whether one would volunteer to drive the truck in the parade. It was understood they were not to be paid. No volunteer was obtained from the drivers of West Brothers, and Mr. McInnis, as a member of the committee, then contacted the superintendent of another company, Motor Repair, Inc., to see if that company had a man who would take off and volunteer to drive in the parade. As a result of this inquiry, Jack Lippencott agreed to do so. He was to drive the truck without pay. There was no proof he was an incompetent driver. Lippencott agreed that he would serve but stated he would have to change his shirt and put on some clean clothes. After doing this, he took the truck, went to the high school where the trailer was located. Mr. McInnis had told him the location of the trailer and stated that he had ''asked'' Lippencott to attach the truck to the trailer and drive it to Mississippi Southern College and he, McInnis, would meet him there and show him where the trailer was to be parked so that the band might be loaded.

The accident here involved happened while Lippencott was driving the truck and trailer to the college. There is no question involved here as to the negligence of Lippencott. It seems that the truck ran into the back end of a bus driven by appellee when the bus was stopped. Lippencott had never been employed by West; there was no agreement to pay him for this work. He had volunteered to drive without compensation, presumably from a sense of civic pride. What Mr. McInnis did in securing the truck and trailer was not in the interest of West Brothers, but was in the furtherance of the purpose of the local citizens to promote the in-

terest of the college and its football team. He was acting as a member of the group promoting the parade.

If it had been in connection with the business of West Brothers, it seems they had a number of drivers employed and could have directed one of their own drivers to operate the truck. Mr. McInnis did not do this but asked if one would volunteer to drive without pay; and on failure to secure such a driver from West Brothers' own crew, went to another company where one was found. There is no evidence that the business of West Brothers was being promoted by the driving of the truck. The only contention along this line is that West Brothers' name appeared on the truck and that, therefore, they were receiving the benefit of whatever advertising this might be worth. This was only something incidental, however, and could just as likely apply if the truck had been loaned to one of the employees for his own personal pleasure.

The general rule is as stated in 60 C. J. S., Motor Vehicles, Section 425, page 1041, as follows:

''Apart from statute, a person is liable for injury from a motor vehicle only if he actually operates or controls it or is the master or principal of the person whose act occasions the injury.

''In order to impose liability on a person for an injury occasioned through the operation of a motor vehicle, he must, except where liability is otherwise imposed by statute, either be in the actual operation thereof, or in the control thereof, or stand in the relation of master or principal to the person whose act occasions the injury.''

The same rule is stated in 5 Am. Jur., Automobiles, Section 353, page 694:

''At common law, liability for the negligent use of an automobile by one other than the owner cannot be predicated against the owner merely because of such ownership. The owner of a car, in the absence of a

statute changing the common-law rule, is not liable for the negligence of one who stands in the relation of independent contractor in the operation of the car. Whether the driver is an employee or an independent contractor is determined by the general principles applicable to that phase of the law. . . . ."

In Braun v. Averdick, an Ohio case, 150 N. E. 41, the facts are stated as follows:

"The testimony offered by the plaintiff affecting the liability of Braun & Kipp is very brief. Braun & Kipp were the owners of a truck used in their business. One Clarence Schroer was the driver of this truck, and had been employed as such for one or two years. On Sunday, July 27, 1919, a basket picnic was to be given at Mt. Alverno for the benefit of a society termed the 'Brothers of Protectory.' A man by the name of Stein, representing this brotherhood, called up Braun by telephone, and asked him 'whether or not they would give them the truck on Sunday, on July 27th.' Braun told Stein he would ask his driver Schroer whether he would drive the truck; that he would not pay him anything for doing so because it was Sunday. Braun reported Stein's request to Schroer and said to him:

" 'If you want to do that work, it is a case of charity. If you want to go out and report to them what they may ask you to, you may have the truck.'

"The driver said he would do that. Braun & Kipp were not open for business on Sunday. Schroer testified that Braun said to him:

" 'They want to borrow the truck out at the Protectory. . . . . If you want to drive it, . . . it is charity work. . . . . You are not going to be paid because I am not going to pay you.'

"Schroer took this truck to the end of the car line, and from there he was to haul the people to the place where the basket picnic was held. The truck was used solely for the benefit of the society."

The lower court had held that since the driver of the truck was a chauffeur regularly employed by Braun & Kipp to operate the truck, this raised a presumption he was within the scope of his employment at the time of the accident, and, therefore, a prima facie case was made which required submission to the jury. In reversing the case, the Supreme Court of Ohio said:

"The evidence of the plaintiff shows affirmatively, and without room for dispute, that Schroer was not employed by the owners to drive the truck on the Sunday in question; nor was the truck driven in connection with the owners' business, nor for their benefit. The truck was loaned to a charitable organization for a special service, for its own use and benefit, and at the instance of the organization. The owners allowed the driver to operate the truck, but exercised no control over the driver either in requiring him to perform the special service or in directing the manner of its performance; nor was the driver to receive any compensation from the owners. Mr. Stein, acting for the Boys' Protectory, assumed entire control over the driver, and directed the roads he should travel from the end of the car line to the picnic grounds. It is clear that Braun & Kipp's sole connection with the entire transaction was the charitable one of loaning their truck to the society. There is no room for the application of the rule respondeat superior, whereby the owner of the truck can be held for the negligent acts of Schroer. The test of a master's liability lies in proof of the fact that, if the negligent act was done by a servant, it was done in the course of his master's employment and while engaged in the service of the master."

In the Alabama case of Perfection Mattress & Spring Co. v. Windham, 182 So. 6, the plaintiff, a boy of 17 years of age, was seated on the body of a truck owned by a mattress company when it was going through an underpass in Birmingham and ran too close to the wall,

injuring the plaintiff. The complainant was based upon the theory he was an invitee of the defendant and was injured because of the negligence of defendant's servant. The truck was that of the defendant and the Alabama Court had held proof of ownership raises a presumption that at the time of the accident the truck was being operated in the owner's business. However, under their decisions, this was a presumption only and if the evidence showed the truck was not being operated in the company's business the presumption gave way.

The driver of the truck was a machinest for the company and not its truck driver. The time was Saturday afternoon, when the employees did not work; they had organized a baseball team, each player contributing thereto and the company also making a contribution. The driver of the truck was manager of the team, he having been selected by the team itself. Scheduled games were played on Saturday afternoon after working hours. The officials of the company sometimes went with the team on its trips but used their own or company cars. The president of the company agreed to lend the team a company truck, which would carry the players, bats, balls, etc. The team was composed partly of employees and partly of non-employees. None received compensation. The spectators averaged from 200 to 1000. The team was entered in the City League. At the time of the injury of plaintiff, the truck was on its way for a scheduled game; they were on no business of defendant but engaged in a pasttime of their own after working hours. The defendant's company bore no relation to baseball and the Alabama Court was of the opinion that the employees were in no manner acting within the line and scope of their employment. The Court said:

"As often stated in our cases, the act must be not only within the scope of his employment, but also committed in the accomplishment of objects within the line of his duties, or in or about the business or duties as-

signed to him by his employer. Illustrative cases are Wells v. Henderson Land & Lumber Co., 200 Ala. 262, 76 So. 28, L.R.A. 1918A, 115; Republic Iron Co. v. Self, 192 Ala. 403, 68 So. 328, L.R.A. 1915F, 516. And much discussion of the essential elements of the relationship of master and servant is found in General Exch. Ins. Corporation v. Findlay, 219 Ala. 193, 121 So. 710; Birmingham Post Co. v. Sturgeon, 227 Ala. 162, 149 So. 74. The cases of Harrington v. Border City Mfg. Co., 240 Mass. 170, 132 N. E. 721, 18 A.L.R. 610, and Easler v. Downie Amusement Co., 125 Me. 334, 133 A. 905, 53 A.L.R. 847, concerned baseball played by employees out of working hours, and serve to demonstrate that no liability can be fixed upon the employer on the doctrine of respondeat superior. And to like effect, considering the Workmen's Compensation Act, Smith-Hurd Stats. c. 48, Sec. 138 et seq., is the case of Becker Roofing Co. v. Industrial Comm. 333 Ill. 340, 164 N. E. 668, concerning an injury to an employee while attending a picnic, as was the custom to create and stimulate good fellowship.

"Recognizing the force of these principles, as applied to the foregoing facts, plaintiff's counsel insist that the ball team and its entrance into the City League served as an advertisement scheme for defendant, and that so considered Priest, in driving the truck, was acting within the line and scope of his employment. And reliance is had upon the additional facts that the defendant's name was on the uniforms and on the truck, that the games were played before the public, and that Jackson, the president, on cross-examination, stated that he thought, for the purpose of making tax reports, the donations made to the team were charged on the books to advertising. Jackson stated, however, that in any discussion as to the team no advertisement value to defendant was considered, and that he could see very little such value to it, and that the company made such

donation in keeping with 'its democratic attitude toward its employees, and encourages them in such things as sports and outside activities.'

"The fact that defendant's officials assumed such an attitude and displayed some interest in the health and happiness of the employees clearly is not to be weighed against the company, but they should rather be commended therefor. Answering a like suggestion the New York Court in Stenzler v. Standard Gas Light Co., 179 App. Div. 774, 167 N.Y.S. 282, affirmed without opinion 226 N.Y. 681, 123 N.E. 891, involving the loan of a car, as here, to attend an outing, said (page 284):

" 'The respondent claims that the defendant was so interested in the good health and spirits of its employees that this outing may be said to have been a part of its business. But such an argument would practically abrogate the existing law on this subject in this state. An owner who gratuitously loans his car to a servant, or even to a member of his own family, for such person's own particular pleasure, presumably is interested in the pleasure, and, inferentially, in the good health and spirits, of such other person. And yet it cannot be doubted that such particular pleasure is not thereby made the employer's business in any legitimate sense of the words. The test of the employer's liability is such employer's business as distinguished from the employe's business or pleasure in using the car.'

"This discussion gives emphasis also to the fact that the initiation as to the outing came from the employees and not the employer, — a fact here appearing without dispute or contrary inference. Nor is the fact that defendant's name appeared on the truck to be considered as of any probative force upon the question as to whether or not defendant was in fact engaged in advertising its business in this manner. If so, the loan by the company of its car to an employee on Sunday to call on relatives, or attend a funeral, may as well be so denom-

inated. The equipment, including uniforms, was purchased by the team manager, and as the team was that representing the employees of defendant company, it was entirely appropriate the uniforms should so disclose. The defendant had no part in the uniform selection. Jackson testified Edwards (presumably the bookkeeper) had charged the donations on the books to advertising. But this was for the purpose of getting credit in tax matters, with perhaps some foundation when considered as a mere incident, and of itself is not sufficient to discredit his positive testimony that the matter of any advertising advantage was never considered. Jackson does not deny there may not have been some slight value to the company if the team made a good showing. And in a sense it may be conceded that some character of advertisement advantage may accrue to any business or industrial plant by such a team. So likewise would the loan of defendant's car or truck with its name emblazoned thereon, perhaps be of some value as an advertisement, if the employee used it for his own personal use and attended some outing largely attended. The illustrations differ only in degree and not in kind. And yet it could not be said that such an act of courtesy amounted to an advertisement of the employer's business so as to constitute the driver his servant or agent, and held accountable for his acts on the doctrine of respondeat superior.

. . . . . .

"The Iowa Court in Reynolds v. Buck, 127 Iowa 601, 103 N.W. 946, treating a case involving the question of incidental advertisement, said (page 947) : 'The mere fact that the automobile still wore the decorations, and that it might on account thereof attract attention, and incidentally advertise the defendant's business, would not have justified the jury in finding that the son was about his father's business at the time. An inference so farfetched should not be permitted to control and

destroy direct and positive testimony to the contrary.'

"We think these observations applicable here. Any such advertisement was purely incidental, and any inference to the effect that defendant was engaged in the business of its advertisement on this occasion would not only be unreasonable, but, as the Iowa court expressed it, 'farfetched', and not resting upon any substantial basis."

█ █ This Court has given considerable thought to the instant case and is unable to see where in any respect the doctrine of respondent superior applies. We are unable to see where there was any proof of the relationship of master and servant, nor can we see where the driver at the time of the accident was engaged in or about the business of West Brothers. The appellant was entitled to have its motion for a peremptory instruction sustained. The case is therefore reversed and judgment here for appellant.

Reversed and judgment here for appellant.

*McGehee, C. J.,* and *Kyle, Gillespie* and *McElroy, JJ.,* concur.